DRAPER AND KRAMER INCORPORATED, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (2nd Division)    No. 61750

Opinion filed July 27, 1976.

Edwin A. Rothschild, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for petitioner.

William J. Scott, Attorney General, of Chicago (Jeffrey A. Herden, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Draper and Kramer, the petitioner, an Illinois corporation, was charged with a violation of section 9(a) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1973, ch. 111½, par. 1009(a)). A hearing was conducted and after a review of the testimony given, the Pollution Control Board (Board) found that petitioner was in violation of the above statute and imposed a $1000 fine. It is from the finding of the Board and the imposition of the fine that petitioner brings this direct appeal. Ill. Rev. Stat. 1971, ch. 111½, par. 1041; Ill. Rev. Stat. 1971, ch. 110A, par. 335.

The court will consider whether the Board's findings were against the manifest weight of the evidence and whether the respondent was adequately informed of the nature of the alleged violation by the Board's complaint.

In 1960, petitioner constructed a tower on its property to be used for cooling the water from an air conditioning system which serviced two of the buildings it managed. The site of the tower was adjacent to a townhouse development which was not managed by respondent.

On July 23, 1973, one of the residents of the townhouse property sent a letter to the offices of the Environmental Protection Agency (EPA) complaining about the operation of the cooling tower. This letter stated that, when the cooling tower was in operation, it emitted a "yellow colored moisture" which settled upon their property. The letter went on to say that the moisture caused a nonremovable mineral-like deposit to form on windows, and that it also was killing plants and causing a great deal of physical discomfort to the residents of the townhouse complex.

On July 23, 1973, in response to the letter, EPA sent an employee to the cooling tower to investigate the charges. Based upon his findings the EPA sent a letter dated July 26, 1973[1], to petitioner informing petitioner that its cooling tower might be causing air pollution by virtue of the emission of a spray containing a chromate-based rust inhibitor. The following day petitioner replied by letter that it would conduct a full investigation to determine if the chemical in use was the cause of the injuries and property damage of which the townhouse residents complained. Petitioner began

---

[1] This letter is alluded to throughout the proceeding by the parties, but is not part of the record.

to significantly reduce the use of the chromate rust inhibitor on July 28, 1973.

The EPA and petitioner had several meetings concerning the chemicals used in the cooling tower. On August 23, 1973, EPA investigators and petitioner's engineers met at the cooling tower location to further discuss what, if any, steps were being taken to find a solution to the chromate problem. EPA suggested that other non-chromate-based rust inhibitors might be more suitable. This meeting was followed by a letter dated August 24, 1973, in which the EPA urged petitioner to "implement the use of an alternate corrosion inhibiting agent that is non-toxic to prevent further damage to properties and hazard to area residents' health." EPA's letter went on to request that petitioner submit a proposal for a specific solution to the chromate problem within 15 days. After receiving an extension of time, petitioner notified EPA on September 28, 1973, that it had completely discontinued the use of chromate chemicals.

Petitioner did not receive any further correspondence until EPA filed a complaint against them on May 24, 1974. This complaint was filed almost eight months after the petitioner had complied with the EPA's request of August 24, 1973. The complaint stated that between July 23, 1973, and the date of the complaint, petitioner allowed the discharge into the atmosphere of a chromate-bearing "toxic vapor and yellowish mist." This discharge was considered to be a contaminant as defined under section 3(d) of the Act, and was alleged to have interfered with the enjoyment of citizens' property, and to have caused many physical discomforts. The result of this interference was that the residents were forced to avoid using their backyards in order to reduce their exposure to the "aforesaid odors."

At the hearing in July, 1974, several witnesses testified that, when they came into contact with the spray while in their backyards, they noticed an itching of the eyes and nasal congestion. One witness claimed that she developed a rough, scratchy throat. Another said that she developed an earache when exposed to the spray. None of the witnesses, however, offered any medical evidence that these symptoms were the result of contact with a chromate compound, and many of the witnesses testified they experienced no physical effects at all. Several witnesses who stated that they did experience physical reactions to contact with the spray testified that these reactions continued until the hearing, almost nine months after petitioner had ended the use of the chromate rust inhibitor.

In addition to testimony concerning physical ailments, the residents of the townhouse also related how the spray killed vegetation upon which it settled. Several witnesses said the spray left a white deposit on plants, causing them to shrivel and die. However, no resident was able to state for certain that the deposit on the vegetation contained any chromate

chemicals. Moreover, witnesses testified that the plants suffered the adverse effects even on the date of the hearing.

Mel Villalobos, an EPA engineer, testified that he went to the cooling tower's location after receiving the original letter from the townhouse residents. While at the location, he said he observed what he called "water spray drips" coming from the tower. He further stated that, when he came into contact with the spray, he experienced minor skin irritation and burning lips. Neither Mr. Villalobos nor any other EPA staff member presented any evidence which established that chromates caused either the skin irritation or the destruction of the plant life which they observed near the tower.

At the close of all the testimony, EPA and petitioner entered into a stipulation that the cooling tower caused no adverse effects after petitioner discontinued use of the rust inhibitor.

■■ The EPA has the burden of proving all the essential elements of the type of air pollution violation charged. (*Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill. 2d 290, 319 N.E.2d 794; Ill. Rev. Stat. 1973, ch. 111½, par. 1031(c).) The findings of the Board must be supported by the record and must not be contrary to the manifest weight of the evidence. *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 488, 313 N.E.2d 161.

In our opinion the evidence is insufficient to find that the alleged toxic vapor and yellowish mist was a contaminant that caused physical discomfort, damage to vegetation, and unreasonable interference with the enjoyment of property. The nature of the witnesses' complaints is highly subjective. The physical complaints, *i.e.*, nasal congestion, itching of the eyes, scratchy throat, earache, could just as easily have been caused by innumerable other agents. This is especially true here because the complaints of the witnesses continued until the time of hearing, almost nine months after the complete cessation of the use of the chemical, and after the stipulation was entered into between the parties that no further adverse effects were suffered by the witnesses after the petitioner discontinued use of the rust inhibitor. The witnesses' complaints concerning damage to vegetation have the same deficiency. Mr. Villalobos for the EPA said his lips burned on one occasion when he came into contact with the spray. None of the other witnesses, who were nearby residents and in much more intense contact with the spray, support this contention. The introduction by EPA of a scientific treatise to the effect that chromate can cause these physical complaints presents at most a tenuous connection between the alleged toxic vapor and yellowish mist and the injuries here alleged. The testimony to a large extent was that these complaints persisted long after the use of chromate was stopped. Moreover, the record failed to show any scientific tests and the EPA did

not introduce any scientific testimony. The EPA asserts that it need not introduce such testimony because the complaint was not one alleging violation of numerical standards by the Board. Nevertheless, the EPA has the burden of proving all of the essential elements of its case. (Ill. Rev. Stat. 1971, ch. 111½, par. 1031(c).) We believe in this case, because of its highly subjective nature, absent any other substantial evidence that this alleged toxic vapor and yellowish mist caused these injuries, such testimony was necessary.

The Board apparently found in its order that it was not necessary to prove that the toxic vapor and yellowish mist was a contaminant. The testimony, the Board asserts in its order, shows that the water spray itself, regardless of toxicity, is a contaminant under section 3(d). The first time there was any specific mention of such a contention was in the closing argument. There is nothing in the record or the complaint to indicate that the petitioner was being charged with contaminating by reason of the water mist that was being placed in the air. In all of the EPA's suggestions to the petitioner, the recurring theme was to do something about the rust inhibiting chemical. The Board made a specific finding that, when the petitioner informed the EPA that they had ceased using the chemical, the petitioner believed that it was in full compliance. Petitioner apparently maintained this belief for the nine months between the time it ceased using the chemical until the time the complaint was filed and further until the time of the closing argument by the EPA.

The purpose of a complaint is to fairly and unambiguously inform a defendant as to the nature of an action. (*Bauscher v. City of Freeport* (1968), 103 Ill. App. 2d 372, 243 N.E.2d 650; *Hyland v. Waite* (1953), 349 Ill. App. 213, 110 N.E.2d 457.) Although an EPA complaint need not be drawn with the same specificity as pleadings in a court of law, it must nevertheless state in a sufficiently clear manner the charges alleged. (*Lloyd A. Fry Roofing Co. v. Pollution Control Board* (1974), 20 Ill. App. 3d 301, 314 N.E.2d 350.) This is necessary because it is the complaint which states the issues and assists the defendant in the formulation of his defenses. (*Greco v. State Police Merit Board* (1969), 105 Ill. App. 2d 186, 245 N.E.2d 99.) In our opinion the petitioner was not adequately informed of the charge that the water mist as such constituted a contaminant which caused air pollution, so that he could prepare his defense.

■■ It must also be noted that, once it became clear during the hearing that the spray as such was objectionable, petitioner took immediate steps to correct the situation and erected a baffle around the tower to contain the spray. The Board specifically found that the petitioner cooperated fully and quickly to alleviate what at the time of the original letter was only an allegation. It does not appear from the record that a fine would

aid in the enforcement of this act and a fine under these circumstances is inappropriate. *CPC International, Inc. v. Pollution Control Board* (1975), 32 Ill. App. 3d 747, 336 N.E.2d 601.

For the foregoing reasons the order of the Pollution Control Board is reversed.

Reversed.

HAYES and DOWNING, JJ., concur.